IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

TAMMY PENNINGTON,

      Plaintiff,

v.                            CIVIL ACTION NO. 1:21-00335

MERCER COUNTY COMMISSION, et al.,

      Defendants.


**MEMORANDUM OPINION**

On March 31, 2023, the court granted defendants' motion for summary judgment.  See ECF No. 60.  The reasons for that decision follow.

**Background**

This cases revolves primarily around plaintiff Tammy Pennington's allegation that defendant Lawrence Murphy used excessive force in handcuffing her and his refusal to loosen the handcuffs.  On November 18, 2019, plaintiff Tammy Pennington was sentenced to a one-year sentence of incarceration, handed down in Mercer County, West Virginia, for violation of a domestic violence petition ("DVP").  See Deposition of Tammy Pennington, February 22, 2022, at 36-37 (hereinafter "Pennington Depo. at ___") (Exhibit 1 to Defendants' Motion for Summary Judgment) (ECF No. 41-1).  According to Pennington, she appealed the sentence handed down on November 18, 2019, and was granted a hearing before Judge Willis on December 10, 2019.  See id. at 37-38.

Lieutenant Lawrence Murphy, a 20-year employee of the Mercer County Sheriff's Department, transported Pennington from her holding cell in the courthouse annex to her hearing.  See id. at 38-40.

Pennington said that she was "flabbergasted" when she saw Murphy on December 10.  See id. at 30-31.  According to her, Murphy had verbally assaulted her in her driveway sometime in October 2019.  See id. at 31-35.  Of this encounter with Murphy, Pennington was unclear on certain details.

> Q:     Why were you flabbergasted when you saw Murphy [on December 10, 2019]?
>
> A:     Well, because Murphy was part of this case.  He was one of the officers that responded to the home.  He basically had verbally assaulted me in my driveway before I arrested.
>
> Q:     When were you arrested on this?
>
> A:     I want to say the 23rd of October.  I may not be right on that.  There was a total of four different charges.  There was two assault and battery and assault, I believe, and then violation of a DVP.  The three charges of assault were dismissed and the battery.  The only conviction I had was the violation of the DVP.  And I think that was - - I was given a year for that.
>
> Q:     Okay.
>
> A:     And that was on November the 18th.
>
> Q:     So did you plead guilty to - -
>
> A:     Yes.
>
> Q:     - - the - -

A:      The violation of the DVP.

Q:      Who had the protective order?

A:      Well, he wasn't my husband then, but my husband.

Q:      Darrell?

A:      Yes.

Q:      What was the basis of the DVP?

A:      He was basically trying to get me help for my addiction, and during that period I think he thought, you know, that the Mercer County Sheriff's Department would help him help me.

                        * * *

Q:      What was - - how did you come to violate the DVP?

A:      I showed up at his house one night and I wasn't supposed to be there.

Q:      He presumably called law enforcement?

A:      Yes.

Q:      And you said that Murphy verbally assaulted yo in the driveway?

A:      Yes.

Q:      What did he say?

A:      Called me a whore.  Asked my husband why I was there.  Asked my husband if I was his whore.

                        * * *

Q:      That was going to be my next question.  Who all - - if it was just Murphy or were there other officers there too.

A:      No.  Deputy Hatfield was there as well.  He came up on the deck.

                        3

Q:      "He" being Hatfield?

A:      Yes.  Threatened to arrest me.  But I knew at
        that point he didn't have any reason to arrest
        me.  There was no charges.  Like I said, it was
        prior to the DVP.  So, anyway, I thought it was
        in my best interest to go inside and sit down
        and that's what I did.

Q:      Anybody besides Deputy Hatfield and Deputy
        Murphy there that night?

A:      I don't think so.

Q:      So you - - but you were arrested that night?

A:      No, sir.

Q:      Okay.

A:      Not that night.

Q:      You said this happened, you thought, on October
        23rd?

A:      Sometime in the latter part of October.

Q:      Of '19?

A:      Yes.

Q:      When were you arrested on this DVP violation?

A:      I think it was the 23rd.  But the officers had
        been there probably three times before the DVP.

Q:      Okay.  All right.  So did this interaction with
        Murphy happen on the 23rd or was this before
        that?

A:      I think it was before the 23rd.

Q:      Do you have any time frame of when?

A:      Just sometime in October.  Between the 1st of
        October and the 23rd; that's all I can recall.

Q:      Was Murphy present each time?

                                4

A:      No, sir.

Q:      Was Hatfield present each time?

A:      No, sir.

Q:      So it would just be whatever officers were available?

A:      Yeah.  I think Officer Lester and Lacey were the two that actually ended up arresting me and charging me with the assault and battery and all the craziness during that time period.

Q:      And that was - - that was the incident on the 23rd, you think, that you were arrested?

A:      No.  The 23rd was for the DVP violation.

Q:      Okay.

A:      Okay.

Q:      Yeah.  I'm confused.  You're going to have to break this down for me.

A:      There's three other charges.

Q:      Okay.

A:      There was a total of four charges throughout October.  Okay?  Two were assault and battery, one was, I believe, assault, one was a violation of a DVP; so that's four different occasions that officers was at my home during that October period.

Q:      So Lacey and Lester arrested you for what?

A:      I believe assault and battery.

Q:      And then Murphy and Hatfield arrested you?

A:      They never arrested me.  They just came and started trouble and left basically.

Q:      Okay.  So who arrested you on the DVP?

5

A:        I don't recall that officer's name.  I was way
          intoxicated.  I do not recall the officer.

Id. at 31-35.  Pennington admitted that she was using
methamphetamine in October 2019 and that she might have last used
the drug in early December.  See id. at 30.  In any event,
Pennington says she knew Murphy from this earlier encounter.

     According to Pennington, while on the elevator at the
courthouse on the way to the December 10 hearing, Murphy asked
her if she thought she was going home today.  When Pennington
answered in the affirmative, Murphy said:  "Well, you're not
because I'm judge today. . . .  Besides, they don't let liars
go."  Id. at 40.  Then, after exiting the elevator, Pennington
asked Murphy if she could hug her mother and he refused.  See id.
at 40.

     Pennington estimated the hearing lasted three minutes.  See
id. at 40.  When Murphy was taking Pennington back to her holding
cell, he told her "I told you."  Id.  Then Pennington asked
Murphy if she could take off the heavy jacket she was wearing.
According to Pennington:

     A:        We got out of the elevator.  And I had a thick
               jacket on.  I was burning up.  I was sweating.
               I asked him [Murphy] if I could take my jacket
               off and he proceeds to uncuff me one cuff at a
               time, I think.  I don't recall.  Anyway, when
               he put the left cuff back on my hand, I
               immediately told him "That's too tight.  Please
               loosen it."  And I think he shook the cuff and
               he said, "It should be tighter."   And he said,
               "Get in," and I went in and closed the door.

6

Q:      You just dropped a lot of information on me, so
        I want to break some of that back down.  Okay?

A:      Okay.

Q:      So Murphy took you upstairs from the holding
        cell in the annex?

A:      Correct.

Q:      You guys got on the elevator, had a
        conversation.  He asked if you thought you were
        going home?

A:      Yes.

Q:      And then you said he called you basically a
        liar?

A:      Yeah.  I think he even said "bitch" at some
        point.  I don't - - I mean, I know it was a
        lot. . . .

                         * * *

Q:      Okay.  Was there any - - anybody else on the
        elevator with you and Office Murphy?

A:      No.

Q:      So your hearing ends.  I'm assuming, if it's
        taken under advisement, whatever you'd put
        i[t], you're going back to the regional?

A:      Yes.

Q:      Murphy took you back down in the elevator?

A:      Yes.

Q:      Any conversation in the elevator?

A:      Nothing other than I told you and me asking him
        if, you know, he would let me take my jacket
        off because I was sweating.  My face was red.
        That's it.

Q:      So you asked if you could take your jacket off?

                            7

A:      Uh-huh.

Q:      He uncuffs you?

A:      Yes.

Q:      Did he take both cuffs off at the same time?

A:      I don't remember.  I think he done them one at
        a time.

Q:      Which one did he take off first?

A:      I think the right one.

Q:      Okay.  Any - - so when he took - - explain to
        me how that happens.  He takes the right one
        off, you pull your arm out?

A:      (Nodding affirmatively.)

                        *  *  *

Q:      So he uncuffs your right hand, you pull your
        arm out of your jacket?

A:      Yes.

Q:      Does he put your right hand back in cuffs?

A:      Yes.

Q:      Okay.  And then he uncuffs your left hand?

A:      Yes.

Q:      You pull your arm out of your left jacket arm?

A:      Yes.

Q:      And he puts the left cuff back on?

A:      Yes.

Q:      And that was the one that was too tight?

A:      Yes.

Q:      All right.  How - - explain to me what you mean
        by too tight?  What did it do?

A:      Immediately cut off my circulation.  My hand
        immediately went numb.  It was like a tingling.
        I immediately asked him to release it, it's too
        tight.  He said - - he shook it and he said,
        "It should be tighter."  When he shook it, I
        think it even clicked a couple more times
        before he locked it.

                          *  *  *

Q:      And that was - - it was too tight you said?

A:      Absolutely.

Q:      Okay.  So could it - - would it move on your
        wrist?

A:      Barely.  Barely.  And every time I moved my
        arm, it would just dig deeper.  Do you
        understand what I'm saying?

Q:      Uh-huh.  Okay.

A:      I eventually ended up passing out in the cell
        because it was so tight.  That's how bad it was
        hurting me.  I got up in the camera - - in the
        annex building they have a camera that's right
        next to the seat.  I held my cuffs like this
        (indicating), begging, you know, somebody to
        come and loosen it.  They could see it.  It was
        bleeding.  Nobody responded.

Id. at 40-49.

An Officer Wood transported Pennington to the hospital for

medical treatment.  According to Pennington, at the hospital, her

wound from the handcuff was dressed and cleaned and a doctor told

her that her blood pressure and blood sugar may have caused her

to pass out.  See id. at 50-51.  Pennington testified that, while

at the hospital, she tried to file a complaint about what had

9

happened with Lt. Murphy.  <u>See</u> <u>id.</u> at 51-52.  Two days later, on
December 12, 2019, Pennington was in court for another hearing.
<u>See</u> <u>id.</u> at 55-56.  She once again tried to make a complaint
against Murphy.  <u>See</u> <u>id.</u> at 56.  Pennington states that she
"think[s]" she talked to Tommy Bailey and Joe Parks that day.
<u>Id.</u> at 56.  She also thinks a photograph of her injured wrist was
taken on that day although she was not sure.  <u>See</u> <u>id.</u> at 56.
Pennington also states that she made a written statement on that
day which Joe Parks kept.  <u>See</u> <u>id.</u> at 56-57.  Because she didn't
think Parks and Bailey were going to do anything with her
complaint, once Pennington returned to the regional jail, she put
in a complaint at a kiosk at the regional jail.  <u>See</u> <u>id.</u> at 59.
According to Pennington, that complaint went nowhere as well.
<u>See</u> <u>id.</u> at 59.

Pennington does not take issue with the fact that she was
placed in handcuffs on December 10, 2019.  <u>See</u> <u>id.</u> at 103.  She
agreed that she was in custody and, therefore, the use of
handcuffs was appropriate.  <u>See</u> <u>id.</u>

Pennington was in court again on December 18, 2019.  <u>See</u> <u>id.</u>
at 77-80.  According to her, a transport officer or someone with
the Department of Corrections struck her in the chest twice.  <u>See</u>
<u>id.</u> at 77-81.  Pennington testified that Murphy was one of five
or so officers who observed this incident and that Murphy said:
"Hit the bitch again.  Hit her again.  The liar deserves it."

Id. at 85; see also id. at 81 ("[A]nd when I looked, there was about five deputy sheriffs standing there, one of which was Lieutenant Murphy, and he screamed, 'hit the bitch again' and laughed.  Said 'that's what you get for lying, you fucking bitch.'").

Murphy's account of his interactions with Pennington differs significantly.  He testified that he had known Pennington for a year or two prior to the first time he was called to her home in response to a domestic disturbance call.  See Deposition of Lawrence Murphy, February 22, 2022, at 6-7 (hereinafter "Murphy Depo. at ___") (Exhibit 4 to Defendants' Motion for Summary Judgment) (ECF No. 41-4).  Murphy denied calling Pennington a whore or asking her boyfriend/husband if she was his whore.  See id. at 7.

Murphy had no recollection of tightening Pennington's handcuffs.  See id. at 12-13.  In spite of his lack of recollection, Murphy vehemently denied that he would have ever tightened the handcuffs in a manner to cause the injuries shown in the photograph.  See id.  Murphy also did not recall telling Pennington that the handcuffs should be tighter in response to her complaint to him.  See id. at 14.  According to him, if someone complained about handcuffs being too tight, he would loosen them.  See id. at 29.  Of the procedure in placing handcuffs on someone, Murphy testified:

A:      When I put a handcuff on [ ] somebody, it snaps
        around the wrist and comes together.  I take my
        fingers and stick a finger in between the bone
        and the wrist like so and then shut the
        handcuff down on top of it and can feel it.

Q:      What's the [purpose] of sticking your finger -
        -

A:      So you have enough gap in here to keep from
        crushing the handcuff down and making them too
        tight on a person's wrist.

Id. at 29.

In support of their motion for summary judgment, defendants
also submitted the affidavit of Joe Parks.  See Aff. Exhibit 5
(ECF No. 41-5).  In his affidavit, Parks testified that during
the December 2019 timeframe, he was employed as the Chief Deputy
for the Mercer County Sheriff's Department.  See id. at ¶ 8.  He
further testified that he was called to the annex holding cells
due to a complaint by Pennington that Murphy had placed handcuffs
too tightly on her wrist.  See id.  Parks stated that he
"physically examined Ms. Pennington's handcuffs, slid a finger
between Ms. Pennington's wrist and the handcuffs and informed Ms.
Pennington that the handcuffs were not too tight."  Id. at ¶ 9.
Parks testified that he examined Pennington's wrists at that time
and saw no sign of injury related to the allegation that Murphy
tightened the handcuffs improperly.  See id. at ¶ 10.  Parks
advised Pennington "that she should cease pulling on the
restraining chain that linked the handcuffs to another set of

12

ankle cuffs, as this could cause injury to her wrists." <u>Id.</u> at ¶ 11.

According to Parks, on or about December 20, 2019, Public Defender Tim Burks approached him in the Mercer County Courthouse regarding Murphy's use of force against Pennington. <u>See id.</u> at ¶ 12. Parks took a photo of abrasions on Pennington's wrists with his phone and forwarded the photograph to the legal counsel for the Mercer County Sheriff's Department. <u>See id.</u> Parks testified that he witnessed Pennington twisting and rubbing handcuffs on her wrist prior to him taking the photograph. <u>See id.</u> at ¶ 13. Parks denied that he ever took a statement from Pennington. <u>See id.</u> at ¶ 14. According to Parks, Pennington told him "that Lt. Murphy did this and the 'Sheriff' was there and saw it when it first happened. I did not correct her, as it was I who went over there and checked the cuffs." <u>Id.</u>

On June 4, 2021, Pennington filed what she labeled a four-count complaint under federal and state law. <u>See</u> ECF No. 1. Named as defendants in the complaint are: 1) the Mercer County Commission; 2) Mercer County Sheriff Tommy Bailey; 3) Deputy Lt. Murphy; 4) Deputy John Doe I; and 5) John Doe Officers/Deputies II-V. <u>See id.</u> Bailey, Murphy and the John Doe defendants were sued both individually and in their official capacities. <u>See id.</u> In Count I, Pennington alleges that defendants violated her constitutional rights by using excessive force against her in

violation of 42 U.S.C. § 1983.  Count II alleges a civil rights
violation under 42 U.S.C. § 1983 based upon a failure to provide
timely medical care.  Count III is a municipal liability claim
against the Mercer County Commission under 42 U.S.C. § 1983.
Count IV, labeled STATE LAW CLAIMS, sets forth assault and
battery, negligence and invasion of privacy claims against Murphy
and the John Doe defendants.  Count IV also alleges claims for
negligent hiring, negligent retention, negligent supervision,
negligence, and civil conspiracy against all defendants.

Defendants filed a summary judgment motion arguing that they
were entitled to judgment as a matter of law on all claims.  In
response to defendants' motion, plaintiff agreed to dismiss all
claims except for her claims for:

1)   Excessive force under 42 U.S.C. § 1983 against
     Murphy (Count I)

2)   Municipal liability claim against Mercer County
     Commission (Count III)

3)   Assault and Battery against Murphy (Count IV)

4)   Negligent supervision against Mercer County
     Commission and Bailey (also Count IV)

See ECF Nos. 45, 54, and 55.  Therefore, plaintiff has abandoned
any claims arising out of conduct occurring before or after
December 10, 2019.

### Summary Judgment Standard

"A party may move for summary judgment, identifying each
claim or defense—or the part of each claim or defense—on which

14

summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the burden of establishing that there is no genuine issue as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial.  Id. at 322.  If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."  Id. at 250-51.

**Analysis**

*A. § 1983 Claim against Lt. Murphy*

In order to prevail on her claim under 42 U.S.C. § 1983,
Pennington must establish that a person acting under the color of
state law deprived her of a right secured by the Constitution or
laws of the United States.  See Everson v. Leis, 556 F.3d 484,
493 (6th Cir. 2009).  In this case, Pennington contends that Lt.
Murphy used excessive force on her when he put her left handcuff
on too tightly and refused to loosen it.  As a sentenced
prisoner, the Eighth Amendment's ban on cruel and unusual
punishment, rather than the Fourth Amendment, applies to
Pennington's excessive-force claim.  See Whitley v. Albers, 475
U.S. 312, 327 (1986).[1]

_____

[1]     Excessive force claims can be resolved under
the Fourth, Eighth and Fourteenth Amendments—the
applicable amendment depends on the plaintiff's
status at the time of the incident:  a free
citizen in the process of being arrested or
seized; a convicted prisoner; or someone in gray
areas around the two.  When a free citizen claims
that a government actor used excessive force
during the process of an arrest, seizure, or
investigatory stop, we perform a Fourth Amendment
inquiry into what was objectively reasonable
under the circumstances. . . .  When convicted
prisoners bring claims of excessive force, we
turn to the Eighth Amendment, which forbids the
unnecessary and wanton infliction of pain that

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials.  Wilson v. Seiter, 501 U.S. 294, 296-97 (1991).  This includes punishments that "involve the unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976).

The Supreme Court has "reject[ed] th[e] notion that all excessive force claims brought under § 1983 are governed by a single generic standard."  Graham v. Conner, 490 U.S. 386, 393 (1989).

> As we have said many times, § 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred."  Baker v. McCollan, 443 U.S. 137, 144, n.3, 99 S. Ct. 2689, 2694, n.3, 61 L.Ed.2d 433 (1979).  In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.  See id., at 140, 99 S. Ct., at 2692 ("The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged").  In most instances, that will be either the Fourth Amendment's prohibition against unreasonable

---

> constitutes cruel and unusual punishment, and specifically conduct that is malicious and sadistic. . . .  To violate the Fourteenth Amendment rights of free citizens not subject to search or seizure, the conduct of law enforcement officials must shock the conscience, whether it be malicious and sadistic behavior in the context of a fluid and dangerous situation, or deliberate indifference when there is reasonable opportunity to deliberate before taking action.

Coley v. Lucas Cty., Ohio, 799 F.3d 530, 537-38 (6th Cir. 2015) (cleaned up).

17

> seizures of the person, or the Eighth Amendment's
> ban on cruel and unusual punishments, which are
> the two primary sources of constitutional
> protection against physically abusive
> governmental conduct.  The validity of the claim
> must then be judged by reference to the specific
> constitutional standard which governs that right,
> rather than to some generalized "excessive force"
> standard.  See Tennessee v. Garner, supra, 471
> U.S., at 7-22, 105 S. Ct., at 1699-1707 (claim of
> excessive force to effect arrest analyzed under a
> Fourth Amendment standard); Whitley v. Albers,
> 475 U.S. 312, 318-326, 106 S. Ct. 1078,
> 1083-1088, 89 L.Ed.2d 251 (1986) (claim of
> excessive force to subdue convicted prisoner
> analyzed under an Eighth Amendment standard).

Id. at 393-94.

An inmate's Eighth Amendment excessive force claim "involves

both an objective and a subjective component."  Dean v. Jones,

984 F.3d 295, 302 (4th Cir. 2021); Brooks v. Johnson, 924 F.3d

104, 112 (4th Cir. 2019) (same).

> The objective component measures the nature of
> the force employed, asking whether that force
> "was sufficiently serious to establish a cause of
> action."  Brooks, 924 F.3d at 112.  This is not a
> high bar; de minimis or trivial force is not
> enough, but anything more will suffice.  Id.
>
>   The more demanding part of the test – and
> the one on which the district court appropriately
> focused – is the subjective component, which asks
> a single question:  whether the officers acted
> with a "sufficiently culpable state of mind."
> Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir.
> 1996).  As the district court explained, the
> state of mind required here is "wantonness in the
> infliction of pain."  Dean, 2018 WL 4655723, at
> *3 (internal quotation marks omitted); see Iko v.
> Shreve, 535 F.3d 225, 239 (4th Cir. 2008)
> (quoting Whitley, 475 U.S. at 322, 106 S. Ct.
> 1078).  Whether an inmate can establish that
> impermissible motive turns on "whether force was

18

applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21, 106 S. Ct. 1078 (internal quotation marks omitted).

As we have explained, officers employ force in "good faith" – and thus permissibly – when they are motivated by an "immediate risk[ ] to physical safety" or threat to prison order. Brooks, 924 F.3d at 113.  But they cross the line into an impermissible motive when they inflict pain not to protect safety or prison discipline but to punish or retaliate against an inmate for his prior conduct. Id.; see Boone v. Stallings, 583 F. App'x 174, 177 (4th Cir. 2014) ("[T]he Eighth Amendment does not permit a correctional officer to respond to a misbehaving inmate in kind.").  And the use of force on an inmate who is "restrained and compliant and posing no physical threat" raises the specter of such an impermissible motive. Thompson v. Virginia, 878 F.3d 89, 102 (4th Cir. 2017).

On summary judgment, then, the inquiry under the subjective component boils down to whether a reasonable jury could determine that an officer acted with malice, applying force punitively and "for the very purpose of causing harm." Whitley, 475 U.S. at 320-21, 106 S. Ct. 1078 (internal quotation marks omitted); see Williams, 77 F.3d at 765.  Because direct evidence of motive or intent may be hard to come by, the Supreme Court in Whitley v. Albers set out four factors from which "we may infer the existence of th[e] subjective state of mind required for an Eighth Amendment violation." Brooks, 924 F.3d at 116 (alteration in original) (internal quotation marks omitted).  Those factors are:  (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response." Iko, 535 F.3d at 239 (quoting Whitley, 475 U.S. at 321, 106 S. Ct. 1078).  If a reasonable jury could find, based on inferences

19

> drawn under the <u>Whitley</u> factors or other
> evidence, that correctional officers used force
> maliciously to punish or retaliate against an
> inmate, then summary judgment is not appropriate.
> <u>See</u> <u>Brooks</u>, 924 F.3d at 116.

<u>Dean</u>, 984 F.3d at 302-03.  The Fourth Circuit has made clear that

"this subjective standard is unlike the 'objective

reasonableness' test we apply under the Fourth Amendment:  The

question is not whether a reasonable officer <u>could</u> have used

force to maintain discipline, but whether these particular

officers did use force for that reason."  <u>Brooks</u>, 924 F.3d at

113; <u>see also</u> <u>Orem v. Rephann</u>, 523 F.3d 442, 447 (4th Cir. 2008)

(discussing importance of motive to excessive force claims under

<u>Whitley</u>).

According to the Fourth Circuit, "corrections officer cross

the line into an impermissible motive — using force 'maliciously'

and for the 'very purpose of causing harm,' . . . — when they

inflict pain not to induce compliance, but to punish an inmate

for intransigence or to retaliate for insubordination."  <u>Brooks</u>,

924 F.3d at 113 (quoting <u>Whitley</u>, 475 U.S. at 320-21).

The defense of "[q]ualified immunity shields a government

official from liability for civil monetary damages if the

officer's 'conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have

known.'" <u>Wiley v. Doory</u>, 14 F.3d 993, 995 (4th Cir. 1994);

(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  In

20

<u>Saucier v. Katz</u>, 533 U.S. 194, 195 (2001), the Supreme Court laid

out a two-step process for resolving the qualified immunity

claims of government officials.  First, a court must decide

whether the facts that a plaintiff has alleged or shown make out

a violation of a constitutional right.  <u>See id.</u> at 201.  Second,

a court must decide whether the right at issue was "clearly

established" at the time of defendant's alleged misconduct.  <u>See</u>

<u>id.</u>

> A clearly established right is one that is
> "sufficiently clear that every reasonable official
> would have understood that what he is doing violates
> that right." <u>Reichle v. Howards</u>, 566 U.S. ----, ----,
> 132 S. Ct. 2088, 2093, 182 L. Ed.2d 985 (2012)
> (internal quotation marks and alteration omitted).  "We
> do not require a case directly on point, but existing
> precedent must have placed the statutory or
> constitutional question beyond debate." <u>Ashcroft v.
> al-Kidd</u>, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L.
> Ed.2d 1149 (2011).  Put simply, qualified immunity
> protects "all but the plainly incompetent or those who
> knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S.
> 335, 341, 106 S. Ct. 1092, 89 L. Ed.2d 271 (1986).
>
> "We have repeatedly told courts . . . not to
> define clearly established law at a high level of
> generality." <u>al-Kidd</u>, <u>supra</u>, at 742, 131 S. Ct. 2074.
> The dispositive question is "whether the violative
> nature of <u>particular</u> conduct is clearly established."
> <u>Ibid.</u> (emphasis added).  This inquiry "'must be
> undertaken in light of the specific context of the
> case, not as a broad general proposition.'" <u>Brosseau
> v. Haugen</u>, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.
> Ed.2d 583 (2004) (per curiam ) (quoting <u>Saucier v.
> Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed.2d
> 272 (2001)).

<u>Mullenix v. Luna</u>, 577 U.S. 7, 11-12 (2015).  "Because the focus

is on whether the officer had fair notice that her conduct was

unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198 (2004).  In addition, the Supreme Court "has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (internal citations and quotations omitted). According to the Court:

> "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." White, 580 U.S., at ----, 137 S. Ct., at 552 (internal quotation marks omitted). . . .  Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.  An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 572 U.S. ----, ----, 134 S. Ct. 2012, 2023, 188 L. Ed.2d 1056 (2014). That is a necessary part of the qualified-immunity standard. . . .

Id. at 1153.

Whether a right is clearly established is a question of law. See Ray v. Roane, 948 F.3d 222, 228 (4th Cir. 2020).  In deciding it, this court is to consider the Supreme Court, Fourth Circuit, and Supreme Court of Appeals of West Virginia precedent first. See id. at 229; see also Wilson v. Prince George's Cty., Maryland, 893 F.3d 213, 221 (4th Cir. 2018) ("To determine whether a right is clearly established, we assess whether the law

has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.") (internal quotation and citation omitted).

Courts may exercise discretion in deciding which of the two Saucier prongs "should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). "In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." Stanton v. Elliott, 25 F.4th Cir. 227, 233 (4th Cir. 2022) (citing Henry v. Purnell, 501 F.3d 374, 377-78 & n.4 (4th Cir. 2007)).

Pennington contends that Lt. Murphy used excessive force against her when he placed a handcuff on her left wrist and refused to loosen it. The court exercises its discretion to proceed directly to the second prong of the qualified immunity analysis and considers whether the law was such that Lt. Murphy would have known his failure to loosen Pennington's handcuffs violated the Eighth Amendment. "To resolve whether the law is clearly established, a court must initially ascertain the 'circumstances of the case." Brown v. Elliott, 876 F.3d 637, 641 (4th Cir. 2017) (internal quotations and citation omitted); see also District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) ("We start by defining the circumstances with which the officers

23

were confronted.") (cleaned up).  In so doing, the court is cognizant of "the importance of drawing inferences in favor of the nonmovant" while "tak[ing] care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014) (quoting <u>Brousseau v. Haugen</u>, 543 U.S. 194, 195, 198 (2004)).

Therefore, defined at the level of specificity required by the Supreme Court and drawing <u>reasonable</u> inferences in favor of plaintiff, the court must determine whether it was clearly established law in December 10, 2019, that Lt. Murphy's handcuffing of Pennington and refusal to loosen Pennington's handcuff was an excessive use of force where:  (1) there is no dispute that Pennington should have been handcuffed; (2) Pennington admitted that she could move her wrist in the tight handcuff; and (3) when she complained about the tightness of the cuff, Lt. Murphy checked it and determined that it was not too tight.

The undisputed facts are that at the time of the handcuffing incident, Pennington was a transported prisoner and, accordingly, handcuffing her was appropriate.  <u>See</u> Plaintiff's Response to Defendants' Motion for Summary Judgment at p. 12 ("Plaintiff recognizes that she had to be restrained.") (ECF No. 45).  For purposes of this motion, the court accepts as true Pennington's testimony that the handcuff was too tight and that she suffered

an injury as a result.  However, other than Pennington's
speculation, there is no evidence that Lt. Murphy intentionally
placed the handcuff on her left wrist too tightly.  Although
Pennington's brief states that Lt. Murphy's handcuffing of her
was "accompanied by malicious, dangerous and degrading language
and insults such as calling Plaintiff a whore, bitch and liar[,]"
see id., this assertion is not supported by the record in this
case.  Most of the "degrading" language of which Pennington
complains did not "accompan[y]" the handcuffing incident.  First,
the allegation that Lt. Murphy called her a whore occurred
approximately a month and a half prior to the hearing on December
10, 2019.  As for the allegation that Lt. Murphy called her a
bitch on that day, Pennington's equivocal testimony on this point
contrasts with the definitive character of her brief.  According
to her deposition testimony, Pennington was not sure that Lt.
Murphy called her a bitch.  See ECF No. ("I think he even said
"bitch" at some point.  I don't - - I mean, I know it was a lot.
. . .").  This is not sufficient "to generate a genuine dispute
of fact precluding summary judgment."  Long v. Beres, Civil
Action No. 3:10CV532, 2013 WL 139342, at *5 (E.D. Va. Jan. 10,
2013); see also Fallin v. Mayor of Baltimore, Civil Case No.
1:19-cv-01500-JMC, 2021 WL 3725378, at *8 (D. Md. Aug. 23, 2021)
("[W]here there exists credible evidence in the record,
speculation to the contrary will not create a genuine dispute of

material fact to preclude summary judgment."). Likewise, Pennington's testimony that Lt. Murphy called her a "bitch" on December 18, 2019, is not helpful in advancing her claim that Lt. Murphy's use of excessive force against her over a week earlier was sadistic and wanton because it occurred after the handcuffing incident.[2]

These facts, even viewed in the light most favorable to Pennington, do not support an inference that Lt. Murphy applied the handcuffs to Plaintiff's wrist for the malicious and sadistic purpose of causing harm. When Pennington asked Lt. Murphy to remove her handcuffs so she could take off her coat because she was hot, he did so. After allowing Pennington to remove her coat to address her discomfort, Lt. Murphy handcuffed Pennington again. Pennington did not complain that both handcuffs were too tight; only the left one. And, according to her, when she complained to Lt. Murphy that it was too tight, he checked the handcuff. Although he disagreed with her that it was too tight and refused to loosen it, there is insufficient evidence to infer that his refusal to loosen the handcuff was "malicious" or for the "very purpose of causing harm[.]" <u>Brooks</u>, 924 F.3d at 113. No reasonable jury could find, based on inferences drawn under

---

[2] Those comments might, however, have led a reasonable jury to infer that the force inflicted on Pennington on December 18, 2019, was in retaliation for her earlier complaints against Lt. Murphy. However, Pennington abandoned her claims arising out of the events on December 18, 2019.

the Whitley factors or other evidence, that Lt. Murphy's refusal to loosen Pennington's handcuffs was done "maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21.[3]

The court has not located nor have the parties pointed to a single case that would have put Lt. Murphy on notice that his refusal to loosen Pennington's handcuff would violate her constitutional rights. Certainly, Pennington had a clearly established right to be free from the excessive use of force. However, this does not end the inquiry. Rather, the court must ask whether Lt. Murphy had reason to know that, under the circumstances of this particular case, his failure to loosen Pennington's handcuffs could be considered an excessive use of force in violation of the Eighth Amendment. See Wesby, 138 S. Ct. at 591 ("Tellingly, neither the panel majority nor the [plaintiffs] have identified a single precedent—much less a controlling case or robust consensus of case—finding a Fourth Amendment violation under similar circumstances. . . . The

---

[3] Pennington admits that "Murphy's actions of alleged excessive force could seem reasonable and/or an accident if the actions were not accompanied by malicious, dangerous and degrading language and insults such as calling Plaintiff a whore, bitch and liar." ECF No. 45 at 12. Other than her allegations concerning what Lt. Murphy allegedly said to her on these three occasions, Pennington offers no other evidence to show that, in refusing to loosen her handcuff, Lt. Murphy "acted with a sufficiently culpable state of mind." Dean v. Jones, 984 F.3d 295, 302 (4th Cir. 2021).

officers were thus entitled to qualified immunity.") (internal citation and quotation omitted).

In 2018, the United States Court of Appeals for the Eighth Circuit considered a prisoner's claim of excessive force based upon a prison official's refusal to loosen handcuffs.  See Stevenson v. Cordova, 773 F. App'x 939, 946 (10th Cir. 2018).  In affirming the district court's grant of summary judgment in favor of the prison official, the Stevenson court concluded a prisoner's Eighth Amendment rights were not clearly established in this context.  See id.  In so concluding, the court was dismissive of the plaintiff's reliance on cases "governed by the Fourth rather than the Eighth Amendment."  Id.

> [W]e have not found an Eighth Amendment case with sufficiently analogous facts, in this circuit or otherwise, that would have put [the prison official] on notice that his inaction amounted to cruel and unusual punishment.  Our cases involving a use of force against a prisoner who was restrained involved significantly greater force than the refusal to loosen handcuffs alleged here.  See Mitchell v. Maynard, 80 F.3d 1433, 1439, 1440-41 (10th Cir. 1996) (holding jury could find prison guards acted maliciously and sadistically by stripping an inmate, placing him in wrist, ankle, and belly chains, picking him up by his elbows and forcing him to run across a gravel yard, then kicking him when he fell while yelling racial epithets); Miller v. Glanz, 948 F.2d 1562, 1564, 1567 (10th Cir. 1991) (holding allegations sufficient to state an Eighth Amendment claim where officers kicked, beat, and choked a prisoner who was handcuffed behind his back and whose ankles were also restrained).
>
> Thus, Williams was entitled to qualified immunity on Stevenson's refusal-to-loosen claim because the law with respect to his Eighth Amendment rights was not clearly established.

28

Id.; see also Grissom v. Bell, Case No. 20-3156-JWB, 2022 WL 4534620, at *9 (D. Kan. Sept. 28, 2022) (holding that officers were entitled to qualified immunity on "prisoner's refusal to use larger handcuffs claim because the law with respect to his Eighth Amendment claim was not clearly established").

In this case, there is no case law from the Supreme Court, the United States Court of Appeals for the Fourth Circuit, or West Virginia's highest court finding an Eighth Amendment violation under facts similar to those alleged here--a refusal to loosen handcuffs where the officer checked the handcuffs and determined they were not too tight.  There is also not a "robust consensus" of case law from other jurisdictions that the alleged conduct was unlawful, and there is at least one case pointing the other way.

The cases relied upon by Pennington are clearly distinguishable.  In Hill v. Crum, the evidence tending to show that the officers were inflicting pain maliciously and for an improper purpose was much stronger.  727 F.3d 312 (4th Cir. 2013).  The court summarized the facts of that case as follows:

> Without provocation, Crum then assaulted Hill, punching
> him in the abdomen and ribs, and elbowing the side of
> his head.  During the assault, Crum shouted at Hill,
> "break another sprinkler, I'll break your neck." . . .
> The assault lasted about two minutes before Crum moved
> Hill to a holding cell, knocking his head against a
> gate on the way out.  The prison staff kept Hill in
> ambulatory restraints for seventeen hours following the
> assault."

Id. at 315.   Ultimately, however, the court found that the
officer was entitled to qualified immunity because the right he
sought to avail himself of was not clearly established at the
time of the alleged assault.   See id. at 325.

Another case cited by plaintiff, E.W. by and through T.W. v.
Dolgos, 884 F.3d 172 (4th Cir. 2018), is similarly unhelpful.   In
that case, Dolgos, a deputy sheriff and school resource officer,
arrested a ten-year-old girl and placed her in handcuffs after
the girl was involved in an altercation on a bus.   See id. at
177.   Dolgos removed the handcuffs after "about two minutes" upon
deciding not to arrest the child.   Id.   The child, by and through
her mother, filed suit against Dolgos alleging that a violation
of her Fourth Amendment rights under 42 U.S.C. § 1983.   See id.
The district court granted the Dolgos's motion for summary
judgment, concluding that her actions did not amount to excessive
force.   See id. at 178.   On appeal, the United States Court of
Appeals for the Fourth Circuit affirmed, but for a different
reason.   See id. at 187.   The court found that the handcuffing
amounted to excessive force.   See id. at 185. Nevertheless, the
court affirmed the district court's grant of summary judgment
because it found that there was no authority that would have
given the officers notice that handcuffing in that situation was
unconstitutional.   See id. at 185-87.   The only similarity
between this case and Dolgos is that handcuffing was involved in

30

both cases.  Dolgos was a Fourth Amendment case, this case arises under the Eighth Amendment.  The plaintiff in Dolgos was a ten-year-old child while Pennington was a sentenced prisoner.  And, ultimately, the court concluded that E.W.'s right to be free from being handcuffed was not clearly established.  Dolgos, therefore, does not serve to show that the right at issue in this case was clearly established.

"[Q]ualified immunity protects actions in the 'hazy border between excessive and acceptable force.'"  Mullenix v. Luna, 577 U.S. 7, 18 (2015) (quoting Brosseau v. Haugen, 543 U.S. 194, 201 (2004)).  "Precedent involving similar facts can help move a case beyond the otherwise hazy borders between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful."  Kisela, 138 S. Ct. at 1153.  Given the lack of precedent putting Murphy on notice that his specific conduct was unlawful, he is entitled to qualified immunity.

*B. Monell claim against the Mercer County Commission*

The Mercer County Commission asserts that Count III should be dismissed as to it arguing that plaintiff fails to plausibly allege a claim under Monell v. Department of Social Services, 436 U.S. 658 (1978).  "[U]nder Monell, a municipality is liable only for its own illegal acts."  Owens v. Baltimore City State's

Attorneys Office, 767 F.3d 379, 402 (4th Cir. 2014) (citations

omitted) (emphasis in original).

> Pursuant to this standard, a municipality is liable
> under § 1983 if it follows a custom, policy, or
> practice by which local officials violate a plaintiff's
> constitutional rights.  Monell, 436 U.S. at 694, 98 S.
> Ct. 2018.  Only if a municipality subscribes to a
> custom, policy, or practice can it be said to have
> committed an independent act, the sine qua non of
> Monell liability.

Id.  A municipal policy or custom may be established

> (1) through an express policy, such as a written
> ordinance or regulation; (2) through the decisions of a
> person with final policymaking authority; (3) through
> an omission, such as a failure to properly train
> officers that manifests deliberate indifference to the
> rights of citizens; or (4) through a practice that is
> so persistent and widespread as to constitute a custom
> or usage with the force of law.

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 1999) (internal

citation and quotations omitted).

In this case, plaintiff alleges that the violation of

Pennington's constitutional rights was "caused by the

implementation of customs, policies, or official acts of the

Mercer County Commission[.]"  ECF No. 1 at ¶ 26.  In responding

to defendants' motion for summary judgment, however, Pennington

never points to any specific custom, policy, or official act of

the Mercer County Commission.  In fact, she spends the majority

of her brief arguing for respondeat superior liability against

the Mercer County Commission.  However, "[a]s municipal

government entities, the county commissions cannot be held liable

32

for the alleged actions of their employees under a theory of
Respondeat Superior." Launi v. Hampshire Cnty Prosecuting
Attorney's Office, 480 F. Supp. 3d 724, 732 (N.D.W. Va. 2020);
see also Purcell v. City of Greensboro, No. 1:11CV577, 2012 WL
1718763, at *2 (M.D.N.C. May 14, 2012) ("[A] municipality cannot
be held liable under § 1983 based on a respondeat superior
theory."). Therefore, the Mercer County Commission is entitled
to summary judgment in its favor "if [for] no other reason than
that they rest on the theory of respondeat superior." Hussain v.
University of Md. Med. Sys. Corp., No. 1:08-cv-1658, 2010 WL
2651287, at *1 (D. Md. June 30, 2010).

In any event, plaintiff fails to present any evidence to
support a reasonable conclusion that her alleged injuries were
the result of any Mercer County Commission policy, express or
otherwise. Nor has she presented any evidence that an omission
on the part of the Mercer County Commission manifests deliberate
indifference to the rights of citizens. She also has not put
forth any evidence that would support a condonation theory of
liability against the Mercer County Commission. Because
plaintiff fails to show any involvement (much less the necessary
involvement) on the part of the Mercer County Commission, her
Monell claim fails.

For all these reasons, the court granted the Mercer County Commission's motion for summary judgment as to plaintiff's <u>Monell</u> claim.

*C. Assault and Battery claims*

In West Virginia, a person is liable for battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." <u>Weigle v. Pifer</u>, 139 F. Supp. 3d 760, 776 (S.D.W. Va. 2015) (quoting Restatement (Second) of Torts § 13 (1965)). A person is liable for assault if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." <u>Id.</u> "An activity that would otherwise subject a person to liability in tort for assault and battery, however, does not constitute tortious conduct if the actor is privileged to engage in such conduct." <u>Hutchinson v. W. Va. State Police</u>, 731 F. Supp.2d 521, 547 (S.D.W. Va. 2010).

In this case, plaintiff admits that she should have been handcuffed. <u>See</u> Plaintiff's Response to Defendants' Motion for Summary Judgment at p. 12 ("Plaintiff recognizes that she had to be restrained.") (ECF No. 45). Therefore, Lt. Murphy was

34

privileged to use the reasonable force he used in applying her handcuffs.[4]

Murphy is also entitled to summary judgment on Pennington's assault claim because she has not adequately alleged, much less shown, that an assault occurred here. "Although it is possible to have two separately viable claims wherein a completed assault is followed by a discrete battery, Plaintiff has not alleged that here. Rather, Plaintiff's allegations are all based upon his assertion that an offensive contact actually occurred, which is a battery." Dial v. Higginbotham, CIVIL ACTION NO. 3:22-0316, 2023

---

[4] Lt. Murphy is also likely entitled to immunity under West Virginia law.

> [U]nder West Virginia law, an employee of a political subdivision is immune from liability unless: "(1) [the employee's] acts or omissions were manifestly outside the scope of employment or official responsibilities; (2) [the employee's] acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) [l]iability is expressly imposed upon the employee by a provision of" West Virginia law. W. Va. Code § 29-12A-5(b). The West Virginia Supreme Court of Appeals has explained that West Virginia's "approach to matters concerning immunity historically has followed federal law." City of St. Albans v. Botkins, 719 S.E.2d 863, 868 (W. Va. 2011).

White v. Thompson, CIVIL ACTION NO. 2:21-cv-00581, 2023 WL 2541965, at *5 (S.D.W. Va. Mar. 16, 2023) (Goodwin, J.). In this case, Pennington maintains that Lt. Murphy was acting within the scope of his employment. In addition, as the discussion surrounding the § 1983 claim against Murphy makes clear, there is insufficient evidence to show that Murphy was acting with a malicious purpose, in bad faith, or in a wanton or reckless manner. Nor is there any provision under West Virginia law that expressly imposes liability on Lt. Murphy.

WL 2434293, at *6 (S.D.W. Va. Mar. 9, 2023) (dismissing assault claim but finding that plaintiff adequately alleged a battery); see also Weigle v. Pifer, 139 F. Supp.3d 760, 776 (S.D.W. Va. 2015) (recognizing that separate claims for assault and battery can exist, but finding that plaintiff's claim of assault was superfluous where the "officers did not merely threaten offensive contact with [the plaintiff]—they forcibly arrested him").   In this case, Pennington's "assault claim is entirely subsumed by h[er] claim for battery." Weigle, 139 F. Supp.3d at 776.

   D. *Negligent Supervision*

   Under West Virginia law, a negligent supervision claim "must rest upon a showing that the employer failed to properly supervise its employees and, as a result, those employees caused proximate injury to another." Ferrell v. Santander Consumer USA, Inc., 859 F. Supp. 2d 812, 817-18 (S.D.W. Va. 2012).  "A direct act or omission by a principal is required to hold it primarily liable under a negligent supervision theory." Bourne v. Mapother & Mapother, P.S.C., 998 F. Supp. 2d 495, 506 (S.D.W. Va. 2014). A failure to supervise claim requires an independent finding of negligence on the part of a supervised employee." Id.  According to the Supreme Court of Appeals of West Virginia, the "current definition of this cause of action requires, as a predicate prerequisite of a negligent supervision claim against an employer, underlying conduct of the supervised employee that also

is negligent." <u>C.C. v. Harrison Cty. Bd. of Educ.</u>, 859 S.E. 2d 762, 774 (W. Va. 2021). In C.C., the court affirmed the circuit court's dismissal of a negligent supervision claim where "all of the acts alleged to have been committed by the Assistant Principal were comprised of intentional conduct, [and] the circuit court correctly ruled that the Petitioners had not made the requisite predicate showing of the Assistant Principal's negligence to support a claim of negligent supervision by the Board"). <u>Id.</u> at 775.

In this case, the allegedly wrongful conduct on the part of Lt. Murphy was intentional conduct, not negligence. Therefore, it cannot form the basis of a negligent supervision claim. <u>See Pajak v. Under Armour, Inc.</u>, Civil Action No. 1:19-CV-160, 2023 WL 2726430, at *12-13 (N.D.W. Va. Mar. 30, 2023) (granting summary judgment on negligent supervision claim where conduct of supervisee was intentional); <u>Braley v. Thompson</u>, CIVIL ACTION NO. 2:22-cv-00534, 2023 WL 2351881, at *4 (S.D.W. Va. Mar. 3, 2023) (dismissing negligent supervision claim where "all of the Deputies' alleged wrongful conduct is intentional and therefore cannot form the basis of a negligent supervision claim") (Goodwin, J.); <u>Gold v. Joyce</u>, CIVIL ACTION NO. 2:21-cv-00150, 2021 WL 2593804, at *10 (S.D.W. Va. June 24, 2021) (dismissing plaintiff's negligent supervision claim where plaintiff alleged only intentional conduct) (Johnston, C.J.); <u>Carroll v. USAA</u>

37

Savings Bank, CIVIL ACTION NO. 3:16-11120, 2017 WL 811491, at *3 (S.D.W. Va. Mar. 1, 2017) ("As Plaintiff alleges only intentional conduct by Defendant's employees, Plaintiff fails to assert underlying negligence in the complaint.  Without allegations of underlying employee negligence, a separate claim for negligent supervision fails as a matter of law.) (Chambers, C.J.).

However, even if intentional conduct could form the basis for a negligent supervision claim, Pennington has failed to show that the Mercer County Commission or Sheriff Bailey negligently failed to supervise Lt. Murphy.  There is no evidence that defendants were aware of prior instances of excessive force by Murphy and failed to take action.  In fact, Murphy testified that this was the first time in his career that someone claimed that he had used excessive force against them.  See Murphy Dep. at 26. Joe Parks confirmed that Lt. Murphy had "no record of use of force."  Parks Aff. at ¶ 17.  Therefore, Pennington has failed to adduce any evidence that defendants were negligent in their supervision of Lt. Murphy.  See Jafary v. City of Beckley, CIVIL ACTION NO. 5:20-CV-00647, 2021 WL 6125831, at *9 (S.D.W. Va. Dec. 28, 2021) (granting summary judgment on negligent supervision claim where defendant officers had "no complaints like [plaintiff]'s listed in either of their employee files") (Goodwin, J.).

38

## **Conclusion**

Based on the foregoing, defendants' motion for summary judgment was **GRANTED**.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.

It is SO ORDERED this 23rd day of May, 2023.

ENTER:

David A. Faber
Senior United States District Judge